William B. Steinhardt v. Commissioner. Milton Steinhardt, Annette Steinhardt v. Commissioner. Milton Steinhardt v. Commissioner. William B. Steinhardt, Ada K. Steinhardt v. Commissioner.
Steinhardt v. Commissioner
Docket Nos. 16043, 16044, 16045, 16046.
United States Tax Court
1948 Tax Ct. Memo LEXIS 68; 7 T.C.M. (CCH) 752; T.C.M. (RIA) 48209; October 18, 1948
*68 Jay O. Kramer, Esq., 19 Rector St., New York, N. Y., and Maurice Lebauer, Esq., for the petitioners. W. A. Schmitt, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These cases were consolidated for hearing and involve the following deficiencies in income taxes: Docket
Docket
Docket
Docket
No. 16043
No. 16044
No. 16045
No. 16046
1943
$7,231.85
$8,416.69
1944
$ 1,644.32
$ 1,134.62
1945
22,686.12
13,191.81
The issue as to 1943 is whether a certain debt became worthless in the taxable year, and if so, the amount of the deduction. The issue for 1944 and 1945 is whether respondent erred in denying deductions for net operating loss carry-overs in 1943, arising from deductions taken in that year for worthlessness of the debt. The facts set forth in a stipulation are found as stipulated. Portions thereof necessary for consideration of the issues will be incorporated with facts found from other evidence, in our Findings of Fact Petitioners Milton Steinhardt and Annette Steinhardt, and William B. Steinhardt and Ada K. Steinhardt are, respectively, husband and wife, and filed joint *69 returns for 1943 with the collector for the second district of New York. Petitioners William B. Steinhardt and Milton S. Steinhardt, hereinafter sometimes referred to collectively as the Steinhardts, likewise filed their returns for 1944 and 1945 with that collector. During the years 1929 to 1938 petitioner William B. Steinhardt and petitioner Milton Steinhardt, his brother, were partners engaged in a general brokerage and commission business and as specialists on the New York Curb Exchange under the name of Steinhardt & Co. At all times since 1922 they have been members of the Curb Exchange. The activities of the partnership consisted of (a) buying and selling stock for outsiders for commissions, known as a commission business; (b) acting under clearance accounts on a fee basis, as brokers for other brokers who receive orders from other brokers; (c) executing on the floor of the Exchange for other brokers for part of their commission, orders for stocks in which the firm specialized; and (d), as required by rules of the Exchange for the creation of markets, trading as specialists in stocks in which the firm specialized. Benjamin K. Kallen, a brother-in-law of William B. Steinhardt, *70 was a member of the Curb Exchange from about 1922 to 1929 on the seat of another member, but did not clear any stock through the partnership. In 1929 the partnership agreed to finance, by supplying cash and endorsing notes, the purchase by Kallen of a seat on the Curb Exchange for $234,000. Thereafter to 1934, the partnership advanced cash to Kallen for that purpose and paid part of the notes given by him in connection with the purchase. The advances and payments were charged to Kallen in a special account set up on the books of the partnership. No other debts of Kallen to the partnership were charged to the account. The last charge to the account was made in June 1934. No payments were received on the account, including interest, prior to 1943. During the years 1929 to 1934 Kallen became indebted to the partnership in the sum of $152,189.15, on account of payments made for the purchase of the seat on the Curb Exchange, and interest thereon. During that time Kallen rented desk space in the office of the partnership. It is not unusual for a member of the Curb Exchange to loan money for the purchase of a seat on the Exchange to place the borrower in a position to "clear" stock through *71 the lending broker. At all times after the partnership agreed to finance the purchase of a seat on the Curb Exchange for him, Kallen gave to the partnership such business as he had in stocks in which the partnership specialized. In 1929 the partnership had clearance accounts with about fourteen other brokers. In 1934 the partnership discontinued its clearance accounts but continued to act as specialists and traders. From 1934 to 1943, Kallen did a commission business on the floor of the Curb Exchange. On February 7, 1938, the partnership was dissolved and its assets were distributed to the partners. The fair market value of the assets of the partnership was $22,877.93, including $13,066.33 as value of the indebtedness of Kallen in the sum of $152,189.15, incurred for the purchase of a seat on the Curb Exchange, and $1,532.40 for other transactions, a total of $153,721.55. Thereafter to 1943, inclusive, the Steinhardts continued to do a commission business and operate as traders and specialists on the Curb Exchange under a joint account. In about July 1938, the Steinhardts, at the request of Kallen, agreed to consider an offer of settlement of his indebtedness. Negotiations *72 resulted in the drafting in July 1938 of an agreement providing for settlement of the indebtedness for $30,000, payable $5,000 on January 1, 1939, $1,250 on July 1, 1939, and a like sum quarter-annually commencing January 1, 1940, subject to additional amounts in the event Kallen sold his seat on the Curb Exchange for a price in excess of certain amounts. The basis for the amount of the settlement was the amount of money Kallen thought he would be able to obtain to pay the obligation. The agreement was not executed because of inability of Kallen to obtain funds with which to make the payments. Kallen informed them that he had an opportunity to become president of a transportation business to be financed by one of his clients and that if the venture was as successful as he expected it to be, that he might be able to pay the debt in full. During 1939 and 1940 he was president of a bus company engaged in the transportation of passengers from Radio City to the World's Fair. At some undisclosed time after 1938 a daughter of the individual who financed the transportation business in which Kallen was engaged in 1939 and 1940, informed the Steinhardts that if she and Kallen married each *73 other, that she would see to it that Kallen's debt to them was paid in full. Kallen discontinued seeing the lady in 1941 or 1942. The Steinhardts never asked Kallen to give them a note for or security for the payment of the indebtedness, or obtained a financial statement from him prior to 1943. Including the indebtedness to them, they considered Kallen to be a bankrupt in 1939 and 1940. Regulations of the Curb Exchange gave the Steinhardts the right to assert a lien on the seat of Kallen on the Curb Exchange for the amount of the indebtedness. Kallen was prohibited from engaging in the specialist business on the floor of the Exchange from April 1, 1938, to July 15, 1941. During that period he was permitted to transact a commission business and trade for his own account on the floor of the Exchange but did not derive any taxable net income from the activities. On May 21, 1942, the membership of Kallen on the Curb Exchange was suspended for nonpayment of dues and the suspension continued until February 9, 1943, when he resumed his activities on the floor of the Exchange. During the suspension period, Kallen could not conduct any business on the Curb Exchange. Kallen borrowed $750 *74 to pay his dues in the Curb Exchange. During the period of prohibition and suspension, Kallen was not in a position to give the Steinhardts any business. Upon the reinstatement of his membership, in February 1943, Kallen resumed activities on the Curb Exchange. By that time the war had the effect of increasing the volume of general business on the exchange. The Steinhardts observed that Kallen was not transacting as much business as he handled before his suspension or should be doing. Such knowledge and the fact that Kallen had been in previous years given sufficient opportunity to settle caused the Steinhardts, in May 1943, to confer with Kallen with regard to the settlement of his indebtedness to them. The Steinhardts concluded from a financial statement submitted to them in May 1943 by Kallen, at their request, that Kallen was practically bankrupt at that time. The Steinhardts offered to accept $5,000 in settlement of their claims. Later Kallen informed them that he could not raise such an amount but would be able to raise $2,000 and would pay one-half of it to each for the debt. Settlement was made on that basis on October 13, 1943. Kallen borrowed, from other than the Steinhardts, *75 $2,000 with which to make the payment. In May 1943, Kallen settled for $250 a debt of $25,000 for money borrowed from an individual. In 1938, after the partnership was dissolved, and in subsequent years to 1942, inclusive, William B. Steinhardt reported income from his business of $1,251.28, $184.12, $316.46, $204.13 and $4,061.69, respectively. In 1943 he reported a loss of $3,523.91 from his business and $27,315.46 as income from partnerships, fiduciary income and other income, including $2,357.41 from the joint account with his brother, Milton Steinhardt. In his returns for 1938 to 1941, inclusive, Milton Steinhardt reported as income from trading, the amounts of $88.74, $106.80 (loss), $380.64 (loss) and $350.47, respectively. In 1942 he reported gross income of $4,670.44, consisting of $608.74 net gain and $4,061.70 as income from partnerships, fiduciary income and other income. In 1943 he reported gross income of $21,890.97, consisting of $2,224.77 as income from his business as a broker and $24,115.74 as income from partnerships, fiduciary income and other in-income, including $2,357.42 from the joint account with William B. Steinhardt. From 1938 to 1943 the high, low *76 and average selling price for seats on the Curb Exchange were as follows: 1938
1939
1940
1941
1942
1943
High
$17,500.00
$12,000.00
$7,250.00
$2,600.00
$1,700.00
$8,500.00
Low
8,000.00
7,000.00
6,900.00
1,000.00
650.00
1,600.00
Average
13,042.10
9,107.14
7,025.00
1,300.00
890.55
5,355.55 In 1942 the Curb Exchange purchased fifty seats for $1,000 each. Stocks received by members of a partnership engaged in the brokerage business upon its dissolution and then distributed in a new partnership with one or more new partners, are generally entered in the books of the new firm at cost or market, depending upon the practice of the old partnership. In their joint returns for 1943, each of the Steinhardts claimed a bad debt deduction of $75,860.78 on the debt of Kallen. In his determination of the deficiencies the respondent disallowed the deductions upon the ground that the debt became worthless and uncollectible prior to January 1, 1942. In connection with the determination he held that the statutory basis of the debt in the hands of William B. and Milton Steinhardt was $46,916.19 and $47,624.76, respectively, instead of $76,860.78, *77 as shown in the returns, and that the debt was a non-business debt within the meaning of section 23 (k) (4) of the Internal Revenue Code. In his determination of the deficiencies for 1944 and 1945, the respondent held that William B. and Milton Steinhardt did not sustain operating losses in 1943, and, accordingly, disallowed as a deduction taken by the former, a carry-over loss of $45,820.63 in 1944 and $38,249.46 in 1945, and by the latter $47,020.57 in 1944 and $41,545.13 in 1945. Opinion The statute allows as deductions "Debts which become worthless within the taxable year". Section 23 (k) (1), Internal Revenue Code. Petitioners had the burden of proving that the uncollected portion of the debt became worthless within 1943, the taxable year. The respondent disallowed the deduction upon the ground that the debt became worthless prior to January 1, 1942, and his determination in that regard must stand in the absence of proof that the uncollected portion of the debt did not become worthless until 1943. The parties stipulated that the debt, totaling $153,721.55, had a fair market value of $13,066.33, at the time of dissolution of the *78 partnership on February 7, 1938. Substantially all of the debt, $152,189.15 in amount, was incurred for the purchase of a seat on the Curb Exchange, and interest thereon. Until the settlement in 1943, Kallen never made a payment on the primary debt and it does not appear that until then, that he paid anything on his other obligations to the Steinhardts. As early as July 1938, the Steinhardts, who testified that at that time they "pretty well knew his [Kallen's] financial condition", were willing to settle their claims for $30,000, payable in installments over a period of about five years, subject to payment of an additional amount in case Kallen sold his seat on the Curb Exchange for a specific amount. The Steinhardts considered Kallen to be bankrupt in 1939 and relied upon the latter's venture into the transportation business and prospects of marriage to a woman of wealth for sources of payment. Kallen was president of the transportation company in 1939 and 1940; otherwise the evidence tells us nothing of the success of the enterprise. His prospects of a rich marriage apparently ended in 1941 or 1942, when he ceased courting the alleged wealthy lady. In the meantime Kallen's use *79 of his seat on the Exchange was restricted for three years and three and one-half months, commencing April 1, 1938, and his membership was suspended for about nine months, commencing in May, 1942, for non-payment of dues. During the first of such periods, Kallen's right to use his seat on the Exchange was curtailed and during the second period he was denied the right to use his seat for any purpose. Aside from the position he held in 1939 and 1940 as president of a bus company, it does not appear that Kallen had any other source of income. The net worth of Kallen, if anything, at material times, is not shown. The value of his seat on the Curb Exchange dropped to a low of $1,000 in 1941 and to $650 in 1942, in which year the Exchange itself purchased fifty seats for $1,000 each. Reinstatement of his membership on the Exchange was accomplished in 1943 by use of borrowed funds. The record discloses no other asset of Kallen at any time. Further discussion of the facts would serve no useful purpose. From a consideration of all of the evidence we conclude that the respondent did not err in determining that the debt became worthless prior to January 1, 1942. In view of the conclusion *80 reached on the primary issue, it follows that respondent committed no error in disallowing the deductions claimed in 1944 and 1945 for net operating loss carry-overs in 1943. Decision will be entered for the Respondent.